The opinion of the court was delivered by
Blanchard, J.
The plaintiff is a corporation doing a banking business at Opelousas, Louisiana. In January, 1896, Alphonse Levy was its president and Julius Meyers was one of its directors. They had been filling such positions for several years.
In that month there was published in one of the newspapers of the town a quarterly statement of the condition of the bank. This was furnished under the oath of the cashier, J. T. Skipper. It dkowed the bank to be not only solvent, but prosperous. Overdrafts to the extent of $4,527.17 only were declared to exist.
This statement was false and perjured.
One month later Levy, the bank’s president, was dead by his own hand, and an investigation into the affairs of the bank disclosed that it had been looted and wrecked.
This was accomplished, in the main, by means of overdrafts drawn by the mercantile firm of J. Meyers & Oo., the largest business house in the parish.
The members of this firm were Julius Meyers and Alphonse Levy. The aggregate of the overdrafts of the firm exceeded $54,000, an amount in excess of the capital stock of the bank.
The announcement of the insolvency of J. Meyers & Co. followed and liquidators to wind up its affairs were appointed. Before its failure the real estate owned by the firm and its members had been covered by mortgages for large amounts.
Criminal proceedings were taken against Julius Meyers and J. T. Skipper for the part they had taken in wrecking the bank.
While the liquidation of the affairs of J. Meyers & Co. was being pro *1771 eeedecl with, a new commercial concern, known as the Opelousas Mercantile Company, Limited, arose upon its ruins. The organizers and stockholders of this association were the brother-in-law and four nephews of Julius Meyers. One of the nephews, Isaac Roos, became president of the corporation.
This concern installed itself at the same stand and proceeded to conduct the same character of business as that done by J. Meyers & Co.
It became the virtual successor of that firm, and straightway undertook to possess itself of all the assets of tjhe insolvent house, including valuable real estate in several parishes. To this end it proceeded to purchase at a large discount (about 35 per cent, on the desliar) the outstanding indebtedness of J. Meyers & Co., and in a short time had acquired it all, save about $200.
So that at the time the present suit was brought, the Mercantile Oo. was, practically, the only creditor of the defunct house, holding claims against it and against Julius Meyers of over $100,000.
There is evidence it was considered by some of the people of Opelousas as “Julius Meyers” — that is to say, as the continuation of the same business, at the same stand, by Meyers under a different name.
. Following the disclosure of the looting of the bank, an effort, and it seems a successful one, was made to save it from ruin.
Five of the directors advanced funds to tide it over its difficulties.
This was done in the form of deposits for which the bank issued certificates of deposit. The amount so deposited aggregated $13,000, of • which Julius Meyers furnished $5000, taking, under date of March 12, 1896, a deposit certificate which reads as follows: “Julius Meyers has deposited in this bank five thousand dollars payable subject to conditions (see agreement), in current funds on the return of this certificate properly endorsed.”
The agreement referred to was dated March 11, 1896, and was to the effect that the five directors who signed it had agreed to deposit in the bank the respective amounts set opposite their names, and to leave the same on deposit for the space of twelve months, unless the Board of Directors should decide that the financial condition of the bank admitted of the withdrawal of the same, in whole or in part, before that time.
At the same time Meyers, notwithstanding the failure of his house, seems to have been able to make a further advance to the bank of $5,000, *1772 this time in the form of the purchase by him of that much interest in the overdraft which the insolvent and dissolved firm of J. Meyers & Co. owed the bank.
The liquidators of his firm (of whom he was one) also made an advance to the bank, about the same time, in the nature of an anticipated dividend upon the bank’s claim .against the firm.
This last advance amounted to $10,125. It thus appears that the bank received in March, 1896, on account of the overdraft of J. Meyers & Co., $15,125, and had advanced to it by the five directors aforesaid the further sum of $13,000, making- in all $28,125, enabling it to continue business.
Following the death of Alphonse Levy, E. M. Boagni had become president of the bank.
On June 17, 1896, a letter was written him from New Orleans suggesting terms of settlement or purchase of the bank’s claim for overdraft against J. Meyers & Co., in these words:—
“Mr. Upton says that if the St. Landry bank will agree to accept 35 per cení, on the face of its debt, keeping, besides, what has already been paid to it, he believes that the creditors can be 'settled with at 35 per cent, of the face of their claims. I am satisfied the oiler will be made if the bank will accept. Please let us know at once whether the bank will settle on the terms proposed. If it will, Mr. Roos will come up at once.”
This letter was written by Mr. E. D. Saunders of the New Orleans bar, who had been engaged professionally in connection with the failure of J. Meyers & Oo. in Opelousas.
The “Mr. Upton,” referred to in the letter, is Mr. IT. E. Upton, also of the New Orleans bar. As the suggestion of settlement came from him, it is important to inquire whom he was representing in proposing it. His testimony was not taken and he does not appear as counsel in the case.
It is claimed by defendants that he was the attorney of Mr. Henry Roos, Sr., one of the proposing purchasers of the bank’s claim against Meyers & Go. This Mr. Roos was the brother-in-law of Julius Meyers.
The president of iihe bank, however, testified that he considered the proposition contained in the S/aunders’ letter as coming from Julius Meyers, since it was submitted at the instance of Mr. Upton, whom he knew to be the attorney, or counsel, of Meyers. Certain it is that Mr. *1773 Upton had been the adviser of Meyers in his business trouble and had gone to Opelousas in that capacity. Isaac Roos, who testified, while claiming that Upton represented Henry Roos, Sr., in making the offer, admits that he was at the same time the attorney of Julius Meyers. Both Isaac Roos and Henry Roos, Sr., were in New Orleans at the time and the “Mr. Roos” of whom the letter speaks might have been either of them. Both were stockholders in the Opelousas Mercantile Company.
Mr. Boagni, president of the bank, answered the Saunders letter on the 19th of June — two days later — as follows: “That the bank would, for immediate settlement of the J. Meyers & Oo. claim, accept 35 per cent, on the face of its claim, not taking into account nor being held to account for money already received.”
Later it developed that Isaac Roos and his associates, who formed or were about to form, the Opelousas Mercantile Go., Limited, were to be the purchasers of the bank’s claims against J. Meyers & Co.
In pursuance of the purpose of this corporation to acquire control by discount of all the claims outstanding against that firm, Isaac Roos appeared at the bank on July 31, 1896, with a form for the sale and assignment of the bank’s claim to himself and associates.
This was handed to the president of the bank, who caused duplicate type-written copies to be made, first adding in clauses toi make it conform to the bank’s understanding of the transaction.
But Roos did not propose to deal solely with the bank’s president in the matter of the purchase of so large a claim, and suggested that the Directors be assembled to authorize the deal.
Accordingly a meeting of the Directors was then and there called, and at that meeting the agreement proposed to be entered into, as typewritten in the bank, together with an important addition made thereto by Isaac Roos, was submitted, and a resolution was passed formally adopting it and authorizing the president to execute the same on behalf of the bank. The agreement was recited at length in this resolution and spread upon the minutes of the meeting.
Mr. Roos was present at the bank before and during the time the meeting of directors was held, had carefully read over and re-read the paper embodying the agreement as the same had been type-written at the bank, had demanded the insertion of a clause proposed by him, this *1774 had been done, and he then fully assented to it, and as thus agreed on it was submitted to the Directors and adopted by them.
It was then signed by E. M. Boagni, president of the bank, and by Isaac Roos foi himself “and associates”, without naming the latter.
The clause, and the only one, Roos had demanded should be inserted, was as follows: “This does not include the $8,044.61 now on deposit in this bank for account of liquidators.”
As the case turns on the construction to be placed upon the agreement so executed, we copy it in full as follows:
“For value received, the St. Landry State Bank, of Opelousas, La., through E. M. Boagni, its president, and pursuant to a resolution of its Board of Directors (a copy of which is hereto attached), hereby sells, assigns, transfers and delivers unto Isaac Roos, Henry Roos, Sr., Isidore Silverberg, Nathan F. Roos and Ilenry Roos, Jr., all of its claim for Fifty-Four Thousand Three Hundred and Thirty-Seven and 46-100 Dollars ($54,337.46) against the firm of J. Meyers & Co., of Opelousas, La. (being the amount due said bank by said firm) fully subrogating said Isaac Roos, ITenry Roos, Sr., Isidore Silverberg, Nathan F. Roos and Henry Roos, Jr., to all its rights and actions on said claim, to be exercised and enforced by them as fully as they might have been by said Bank, but for this transfer, sale and assignment.
“It is understood and agreed that this transfer is made without recourse on us.
“That we are not to pay or to he held to account for money receive<ij from the liquidators, or frdm Julius Meyers. 1 This does not include the $8,044.61 now on deposit in this Banile for account of the liquidators.
“That Six Thousand Three Hundred and Thirty-Nine and 37-100 Dollars to be paid in cash; that Six Thousand Three Hundred and Thirty-Nine and 37-100 Dollars, to be paid on or before Twelve Months from date of this agreement; and that Six Thousand Three Hundred and Thirty-Nine and 37-100 Dollars, to be paid on or before Twenty-Four Months from date of this agreement. The deferred two payments to be evidenced by notes signed by Isaac Roos, Henry Roos, Sr., Isidore Silverberg, Nathán F. Roos and Henry Roos, Jr., to be endorsed by the Stock Company to be formed, said notes to bear six per cent, interest from date, and attorney’s fees to be fixed at 10 per cent, in case of suit to enforce payment. I will not assert, nor attempt to enforce against the firm of J. Meyers & Co., nor against the Liquidators, or members *1775 thereof, or their estates, any claim or liability whatever arising from or growing out of the endorsement by said J. Meyers & Co., or by said members thereof as endorsers or sureties of any notes held or owned by us, however acquired.”
The particular clause, about the melaning of which this legal warfare is waged, is that italicized, which, it will be observed, includes the sentence Roos had caused to be inserted.
The bank stipulated: “We are not to pay or to be held to account for money received from the liquidators, or from Julius Meyers”. Roos agreed to this with the addendum: “This does not include the $8,044.61 now on deposit in this bank for account of the liquidators.”
What other moneys had been received from the liquidators and from Julius Meyers?
As already shown:
L Amount Meyers deposited on the 12th of March, under agreement with the other directors..................$ 5,000 00
2. Amount he paid to the bank on account of purchase of an interest in the overdraft due the bank by J. Meyers & Co............................................. 5,000 00
8. Amount advanced by the liquidators of J. Meyers & Co. as anticipated dividend on the overdraft............. 10,125 00
Total...........................................$20,125 00
There is no contention over the last two items of $5,000 and $10,125. It is not disputed that they are covered and were intended to be covered by the terms of the agreement.
The whole controversy is over the first item of $5,000.
The bank contends it is clearly embraced within the scope of the language used and that such was the intendment of the parties at the time.
Defendants assert just the contrary.
Too great latitude was permitted in the court below in the reception of evidence explanatory of the contract and its meaning. None of the answers filed by the several defendants averred error, fraud, or latent ambiguity, and that being' so, the familiar rule of evidence, that parol testimony is inadmissible» against or beyond what is recited in a written act, or as to what may have been said before, or at the time of making it, or since, should have been more strictly enforced. C. C. 2276; H. *1776 D. Vol. 1, Evidence XV. (d), No. 3 et seq. Bills of exception by both sides attest the effort at exclusion.
There was much conflict of testimony. Boagni, bank president, testified the contract meant to include all the money received, except that deposiled by the liquidators. lie says he and others for the bank figured at the time what the bank would realize, under the arrangement, on the overdraft account, and made it out from 70 per cent to 12 per cent, and to get this they included all moneys whatsoever received from Meyers and the liquidators, except the $8,044.61 which was excluded by the express terms of the agreement.
The cashier and several of the directors corroborate him in this, and declare they would not have authorized the transaction had they not considered the $5,000, in controversy herein, included within the moneys the bank was to retain and not be held to account for.
Isaac Roos, the other signer of the contract, testifies that neither the $5,000 nor the certificate representing it, was mentioned, had nothing to do with the transaction, and was not included in the moneys the bank was authorized to retain.
There was testimony corroborative of him in- thesel particulars.
It is not our purpose to analyze the evidence pro and con. Suffice it that our consideration of the case, judging it by the evidence, impresses us that the balance of probability, weight of circumstance, and preponderance of testimony, all support the contention of the plaintiff.
But we need not go beyond the contract itself. It is sufficiently clear and explicit to disclose its own meaning. The bank was not to pay back or be held accountable for money it had, prior to that time, received from the liquidators, or from Julius Meyers. This was not confined to moneys paid to it or received by it on account of, or in reference to, the overdraft of Meyers & Co. It included all moneys the parties named had delivered -into the possession of the bank, except that expressly excluded.
When Roos came to stipulate for exceptions, he must, at his peril, have the excepting clause embrace all money intended not to be included. JSxpressio unius personae, vel réi, exclusio alberius.
It will not do to say there was a certificate of deposit out for this $5,000 and the amount was due to the holder.
The certificate was noil-negotiable in form, and, besides, the evidence discloses it was at that time, certainly just after, in the possession of *1777 Isaac Roos. With the consummation of this purchase of overdraft from the bank, Roos and his associates were carrying out a purpose to acquire, at large discount, all the outstanding claims against L Meyers & Co. They did acquire them all and thus came into the control of all the property and assets of the firm, including the deposit certificate. The liquidation of the firm’s affairs became merged into the business of the Opelousas Mercantile Co., Limited, of which Isaac Roos was president, and the chief liquidator, J'. R. Norman, became the business manager of the corporation.
It thus appears that Roos and his associates, who constitute the Mercantile Co., have a direct interest in maintaining Julius Meyers’ title to the $5,000.00 certificate of deposit. This was admitted on cross-examination by Isaac Roos.
It is quite true that the proposition first made the bank to purchase the overdraft, embodied in the letter of Mr. Saunders of date June 17th, only contemplated that the bank should keep what had already been “paid” to it — i. e. the $5,000.00 paid by Julius Meyers for purchase of an interest in the overdraft, and the $10,125.00 paid by the liquidators as anticipated dividend. But the bank changed this in its letter of June 19th, so as to make it read that the bank should not be held to account for money already deceived, and when the agreement came to be written up this was still further enlarged and made to read that the bank should not pay, or be held to account for money received from the liquidators or from Julius Meyers.
The negotiation to purchase the overdraft, therefore, ended with a stipulation meaning that the bank should not have to pay to Julius Meyers what he had deposited there, as well as that it should not be held to account for money received from him, or from the liqiiidators otherwise.
It will be readily seen there was a marked difference in the language used by Saunders and that used by Boagni, president of the bank, in their respective letters, as well as that incorporated in the agreement itself when it came to be drawn up and signed. The agreement followed the line adopted in Boagni’s letter, using, however, fuller and broader terms, and was accepted by Roos.
“Money received” is not the equivalent of “money paid.” The former has a larger, more comprehensive scope and meaning.
*1778 The bank did not answer Saunders agreeing to settle on the terms his letter proposed.
It accepted a proposition to settle on an agreed basis of 35 per cent., but added other words to the effect that it would retain all moneys it had received from the parties named.
Saunders made use of the words “paid to it” — meaning money paid to the bank on the overdraft or in reference to it.
Boagni made use of the words “already received” — meaning moneys theretofore received by the bank from the parties who figured in the transactions with it, not confining it merely to moneys paid to it on the claims it held against Meyers & Oo., or received in reference to such claims.
The man, who, as a member of the firm, owed the bank’s claim for overdraft, had placed other money there besides the $5,000.00 paid in the purchase, individually, of an interest in the claim, and the words of the contract with Roos and associates were made broad enough in their scope to include such other funds.
This deposit was money the bank was using as it did other bank funds. It had been received by the bank, as hereofore seen, from Meyers to assist it over difficulties which had been brought upon it by him. What more natural or probable, therefore, than that the bank should demand retention of this fund, along with the other moneys, in a transaction consummating the sale,, at a big discount, of its claim for the overdraft to parties who were the close relatives of Julius Meyers, who were buying up all claims against him and his firm, getting possession of all its property and assets, and who had formed or were about to form a corporation which was the practical successor of the firm?
The fact that Boagni, as president of the bank, wrote across the face of the duplicate contract in the possession of Roos, the day following its execution, thd words: “Received payment as per this agreement,” does not militate against this view. That was but.an acknowledgment of payment to him of the cash portion of the purchase money of the sale of the overdraft, and of the reception of the notes for the deferred portion of the purchase money — as per the agreement. It would indeed have been more business-like to have then demanded and insisted upon the delivery of the deposit certificate; but, as already shown, this certificate was not in negotiable form, and the bank had the money it called for in possession, which was the all important matter.
*1779 The president of the bank testified that Julius Meyers told him after the contract was signed that Isaac Roos had the $5,000.00 deposit certificate. Meyers was in Opelousas when the ease was on trial, but did not go on the stand and this statement of the president was not challenged.
In the conversation alluded to Boagni asked Meyers for the certificate. Then it was that the latter referred him to Roos, telling him Roos had it and he would have to deal with him in reference to it. There was here neither a claim of ownership of the certificate, nor a repudiation of anything Roos had done or contracted to do in reference to the certificate.
There are other proofs of the agency of Roos to bind Meyers in this transaction with the bank. In it he disposes of Meyers’ interest (that which he had purchased) in the overdraft. Meyers has never repudiated this. If it does not prove agency, it proves something more than agency, identification of interest between Meyers and the other defendants herein.
In the contract he also stipulated in favor of Julius Meyers that the bank should release him and his firm from liability as endorser or surety on any notes of other persons held by the bank.
Meyers appears to be enjoying the benefit of this stipulation; yet it is now claimed for him that Roos was without authority to represent him in the matter. He ismot to be permitted to take the benefits conferred by the contract and at the same time repudiate its obligations.
These and other circumstances support the contention that one of Isaac Roos’ associates in the deal with the bank was Julius Meyers, and if not this, then that Isaac Roos had authority to speak and act for him in the transaction. The court below erred in holding otherwise on this branch of the case.
Our conclusions are that the contract of July 31, 1896, did by its terms include the $5,000.00 deposit, and that Isaac Roos acted therein for Julius Meyers as well as for himself and other associates, and that Meyers, if he did not confer antecedent authority, subsequently assented to and acquiesced in what was done, thus ratifying the same.
The judgment appealed from must be amended in this particular.
It is, therefore, ordered, adjudged and decreed that plaintiff bank be and is recognized as the owner, as against these defendants, of the certificates of deposit for five thousand dollars issued by it to Julius *1780 Meyers on the 12th of March, A. D. 1896, and it is ordered that defendants herein deliver said certificate of deposit to the said bank.
It is further ordered, adjudged and decreed that on failure to do so within a reasonable time, plaintiff bank, in the alternative, do have and recover from defendants in solido the sum of five thousand dollars, with legal interest from judicial demand until paid, costs of both courts to be taxed against defendants.
And as thus amended the judgment appealed from is affirmed.